**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICTOR SANCHEZ on behalf of himself and all other plaintiffs similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 21-cv-03349 |
| v. | ) ) | |
| GOLD STANDARD ENTERPRISES, INC. d/b/a Binny's Beverage Depot | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT, ATTORNEYS' FEES, COSTS,**
**AND INCENTIVE AWARD**

## I.      INTRODUCTION

Plaintiff seeks final approval of a $220,617.00 Class Settlement that resolves claims brought under the Fair Labor Standard Act (FLSA) and Illinois Minimum Wage Law (IMWL) on behalf of approximately 774 people.  Not a single person objected to the Class Action Settlement, and only one, Parker DeMoss, has filed an election to opt out of it.  (See Second Declaration of Due Diligence, attached as Exhibit 1, ¶11-12).

Plaintiff's lawsuit alleges Gold Standard Enterprises, Inc. ("Binny's" or "Defendant") should have factored additional COVID-19 incentives called Temporary Pandemic Pay and Temporary Bonus Pay into its employees' overtime rates of pay. Binny's disagreed. Rather than fighting over these issues for many years during prolonged litigation, the Parties reached a resolution after vigorous negotiations and executed the Settlement and Release Agreement ("Settlement Agreement") on December 29, 2021.

After the Parties revised the settlement agreement in January 2022 to address the Court's FLSA and Class requirement concerns, on March 24, 2022 the Court preliminarily approved the

1

settlement and finding it "fair, reasonable, and adequate, and in the best interest" of the putative class and collective that was certified for settlement purposes. See Doc.#31.   For the reasons stated below, Plaintiffs requests that the Court grant final approval of the Class Certification and approve the Parties' Settlement Agreement attached as Exhibit 2 and enter the proposed order attached as Exhibit 3.

## II.     LEGAL BACKGROUND AND PROCEDURAL HISTORY

As described in greater detail in the Complaint and Plaintiffs' Revised Unopposed Motion for Preliminary Approval of Class Action Settlement And For Certification Of Claims Pursuant to Fed.R.Civ.Pro 23 ("Revised Preliminary Approval Motion"), Plaintiff's overtime wage claims are based on additional incentive compensation that allegedly were not captured when calculating the regular rate of pay and, thus, the overtime rate of pay for several months between March 15, 2020 and May 8, 2021. Defendant denies any wrongdoing.

While Plaintiff was confident in the claims, there was some uncertainty because an adverse ruling on these or other issues could result in Plaintiff and the settlement class receiving no damages whatsoever. *See* 29 U.S.C. § 207(e)(1). And, along with the unchartered waters of operating in an unprecedented Pandemic, Defendant would likely argue that it acted in good faith pursuant to 29 U.S.C. § 259.  Defendant also would likely argue against certification because this case involved numerous different locations.

Starting in July, 2021, the Parties began settlement discussions that continued for several months. During these negotiations they exchanged payroll records to ascertain class and collective size and damages. All damage calculations were derived from Defendant's payroll data. Through further negotiations the parties reached a proposed class and collective settlement. A copy of the Settlement Agreement is attached as Exhibit 2. On March 24, 2022 this Court granted preliminary

approval of the Parties' Settlement Agreement.

The Notice Program in this case was particularly effective (as explained below, 98.6% of notices were successfully delivered) because many Class Members still worked for Defendant. As an employer, Binny's maintains employee address data. And, unlike most cases where the alleged actionable conduct occurred many years before a settlement is reached, the employees here all worked for Binny's during 2020 or 2021. As such, there is a high level of confidence that the overwhelming majority of Class Members received notice through first class mail.

## III.    SUMMARY OF SETTLEMENT TERMS.

### A. Settlement Awards, IMWL Class and FLSA Collective.

The settlement gives Class Members gross settlement awards, before accounting for attorney fees and costs, claims administration fees, and service award, that are 100% of alleged unpaid overtime wages due to the failure to include Covid-19 incentives in the regular rate of pay. Additionally, the gross settlement awards also include another equal amount representing FLSA liquidated damages, another equal amount representing treble damages available under the IMWL, as well as, 5% monthly penalty on unpaid overtime wages from the date each portion of damages occurred until the end of November 2021. In other words, unlike most settlements that offer a fraction of the available recovery, here the settlement fund constitutes a full recovery.

This is not a claims-made settlement, IMWL Class Members and potential FLSA Collective Members do not need to submit a claim form to receive their Settlement Award payment.

Only one member opted-out of the settlement. With the exception of this one person, upon approval the remainder would become IMWL Class members and will receive their Settlement Awards. Pursuant to this Court's February 4, 2022 order, the back of each check will contain the

3

"Consent to Join and Release Claims" language as follows:

### CONSENT TO JOIN AND RELEASE OF CLAIMS

> By signing and cashing this check: (1) I agree to join the case *Sanchez v. Gold Standard Enterprises, Inc.*, No. 21-CV-03349, in the U.S. District Court for the Northern District of Illinois, and agree to be bound by the Agreement to settle the case; (2) I agree to waive and release all claims for overtime wages or compensation-related damages or penalties (including but not limited to liquidated damages or attorneys' fees) I have or may have against Gold Standard Enterprises, Inc., and/or its affiliates, parents, subsidiaries, predecessors, successors, employees and agents, as asserted in the Lawsuit or that could have been asserted in the Lawsuit for failure to calculate overtime rate of pay, under the Fair Labor Standards Act or the Illinois Minimum Wage Law; and (3) I agree my consent will be filed in the Northern District of Illinois.

When each Settlement Class Member signs and cashes their Settlement Award checks they will be joining the FLSA collective. The signed check consents will be filed with the Court within 200 days of the issuance of the checks. Those that do not sign and cash their checks will not be part of the FLSA Collective and will not be releasing their claims under the FLSA.

### B. Additional Terms.

Within 21 days of the Settlement Effective Date (when the final approval order becomes unappealable), the Settlement Administrator shall issue checks for each FLSA Collective and Illinois Class Members. They shall have 120 days after mailing to cash their checks.

Portions of the Settlement Awards attributable to wages shall be treated as W-2 wages and have applicable withholdings applied. Non-wage portions of awards and portions treated as statutory, liquidated damages shall be treated as non-wage 1099 income and will not have withholdings applied.

Any unused portion of the of the Qualified Settlement Fund up to $10,000 shall be paid to as a *cy pres* in equal amounts to Prairie State Legal Services and Christmas Without Cancer (Oak

Lawn). Remaining funds over $10,000 shall revert to Defendant.

**C.    Notice Obligations were fulfilled.**

Pursuant to the Preliminary Approval Order, the parties carried out their obligations. The Settlement Administrator timely mailed to each the appropriate notice via first class U.S. mail. Additionally, the Administrator updated addresses after consulting the National Change of Address Databases, remailed notices to forwarding addresses, performed skip traces on undeliverable notices to locate valid addresses, and remailed notices to those discovered through these advanced address searches. Ex. 1, ¶¶ 7-10.  Further, the Administrator created a website for Members to visit to get more information about the settlement. Id. ¶11.  For any undeliverable Notices, the Administrator further attempted to obtain correct mailing addresses through advanced Experian tool. Out of a total of 19 undeliverable notices, 8 were successfully delivered to corrected addresses. Id. ¶10  In total, 98.6% of notices were successfully delivered. Id.

**IV.    THE COURT SHOULD GRANT FINAL APPROVAL.**

**A.    Class Action Settlement Approval Process**

Approval of class action settlements is typically a three-step process:

(1) preliminary approval of the settlement at an informal hearing;

(2) dissemination of mailed and/or published notice of the settlement to all affected class members; and

(3) a "formal fairness hearing" or final settlement approval hearing, at which class members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy and reasonableness of the settlement may be presented.

*Manual for Complex Lit.*, at § 21.632–34.

5

This procedure, used by courts in this Circuit and endorsed by the leading class action treatise, safeguards the due process rights of absent class members and enables the district court to fulfill its role as the guardian of class interests. *See* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, at § 11.22, *et seq.* At the formal fairness hearing, Class Members may be heard and further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement may be presented. With this motion, the Parties request that the Court take the last step in the settlement approval process by granting final approval of the Settlement.

**B.    The Parties Have Satisfied the Requirements of Rule 23 and the Court's Notice Procedures Set Forth in the Preliminary Approval Order.**

As to the distribution of notice, in the Preliminary Approval Order, the Court ordered that notice be effectuated as called for in the Agreement, specifically by first-class mail. Rule 23(c)(2)(B) requires the Court to direct the "best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). As the Supreme Court has held, notice by mail provides such "individual notice to all members" in accordance with Rule 23(c)(2). *Id.* Where the names and addresses of class members are easily ascertainable, individual notice through the mail is "clearly the 'best notice practicable.'" *Id*. at 175.

The Claims Administrator, in fact, mailed to each Class Member the appropriate Notice via first class U.S. mail to each Member's last-known physical address, as reflected in Defendant's records and updated with the National Change of Address Database and advanced Experian database searches. See Ex.1, ¶¶ 7-10. Only one (1) Illinois Class Member has opted out, and nobody has objected. Id. ¶¶ 11-12. Additionally, the notice and other documents were posted on a website, www.goldstandardpandemicpaysettlement.com created by the Claims Administrator and

6

this web address was listed on the notice. Id. ¶ 9. Claims Administrator also created an email box for Collective and Class Members to contact with inquiries. Id. ¶ 8. The Parties' efforts to effectuate notice to the Class meets the requirements of Rule 23(c)(2)(B).

**C.     Final Approval is Appropriate Pursuant to Rule 23(E) Because the Settlement is Fair, Adequate, and Reasonable**

Ultimately, "the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (internal citation omitted). Utilizing a five-factor test, a court must consider: (1) the strength of plaintiffs' case compared with the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006); *Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996). Further, a court must not focus on an individual component of the compromise, but must instead view the settlement in its entirety. *Isby,* 75 F.3d at 1199. Finally, a strong presumption of fairness exists when the settlement is the result of extensive arm's-length negotiations. *Hispanics United of DuPage County v. Village of Addison, Ill.,* 988 F. Supp. 1130, 1149 n.6 (N.D. Ill. 1997); *Great Neck Capital Appreciation Inv. P'Ship, L.P. v. Pricewaterhouse Coopers*, 212 F.R.D. 400, 410 (E.D. Wis. 2002). For the following reasons, the class action settlement is fair, adequate, and reasonable, and not a product of collusion and therefore should be finally approved.

**1.     Strength of Plaintiffs' Case as Compared to the Amount of the Settlement and Allocation of the Settlement Payment**

A key consideration in evaluating a proposed settlement is the strength of the plaintiff's case as compared to the amount of the defendants' offer. *See Isby*, 75 F.3d at 1199. However,

"district courts have been admonished 'to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.'" *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). A settlement is fair "if it gives [plaintiffs] the expected value of their claim if it went to trial, net of the costs of trial." *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 682 (7th Cir. 1987) (finding adequate a settlement of ten percent of the total sought due to risks and costs of trial); *Hiram Walker,* 768 F.2d at 891 (settlement approved because "there [was] no showing that the amounts received by the beneficiaries were totally inadequate").

Plaintiff believes that this case is an excellent result for both Class Members because they are, (before accounting for attorney fees and costs, etc.), getting 100% of their alleged unpaid overtime and 100% of FLSA and IMWL statutory damages. Some Members are receiving even more because a floor was created so the minimum gross recovery would be $16.75.

Settlement eliminates the risk that Collective and Class members could recover a lower amount or nothing at all. While the Plaintiff felt confident in the claims, there remains the prospect that Plaintiff might not prevail (or, if he prevails, the recovery might be limited to only a lesser amount of damages than was hoped). Moreover, Defendant could have asserted defenses that may have eliminated or lessened the claims. In particular, Plaintiff also faced the risk of not being able to certify a class or having a collective decertified as certain issues arose, *i.e.*, whether the additional compensation was excludable from regular rate calculations, whether employees are similarly situated, along with the plethora of other defenses that competent defense lawyers (such as those in this case) frequently raise. Defendant may have also attempted to raise novel issues that are new to the law because these payments came as a result of circumstances created by the COVID-19 pandemic.

8

### 2. Complexity, Length, and Expense of Further Litigation

A second factor to be considered by the Court is the complexity, length, and expense of litigation that will be spared by the proposed settlement. *In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). Absent settlement, Defendant would continue to vigorously defend the case. Significant attorneys' fees and costs would be expended by all Parties in investigating the claims further and litigating over class certification. Further litigation would potentially result in dispositive motions, and the possibility of appeals. Additional litigation would increase expenses and would not reduce the risks of litigation to the Settlement Class. *See Isby*, 75 F.3d at 1199; *see also In re Mexico Money Transfer Litig*., 164 F. Supp. 2d at 1019; *see also Great Neck Capital,* 212 F.R.D. at 409-10. Accordingly, the remaining burden, expenses, and risks for the Collective and Class Members would be substantial as continued litigation would require resolution of complex issues at considerable expense. "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 474–75 (S.D.N.Y. 2013). This is especially pertinent as this Settlement would put money in the hands of working-class families during the ongoing Covid-19 pandemic without delay, when they likely need it the most.

### 3. There is No Opposition to the Settlement

The Plaintiff supports the settlement, as do Class Counsel and Defendant. Moreover, Class Counsel is not aware of any opposition to the settlement. Class Counsel has not spoken to any Collective or Class Member opposed to settling their claims and receiving payments. The lack of opposition to a class action settlement "indicates that the Collective and Class Members consider the settlement to be in their best interest." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *6. The Court-

approved Claims Administrator diligently implemented the Notice Plan, and the objection and exclusion deadlines have passed without a single person objecting to the Settlement. That no one objected to the Settlement is powerful evidence of the Class's support for the Settlement. *See McDaniel v. Qwest Commc'ns Corp.*, No. CV 05 C 1008, 2011 WL 13257336, at *4 (N.D. Ill. Aug. 29, 2011) (finally approving settlement with no objections and noting that "[a]n absence of objection is a 'rare phenomenon[]' and 'indicates the appropriateness of the request[]'") (citations omitted); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (stating that "[t]he absence of objection to a proposed class settlement is evidence that the settlement is fair, reasonable and adequate"). Additionally, only 1 Illinois Class Member opted-out of the settlement. This factor thus strongly supports granting final approval to the Settlement.

### 4. Opinion of Counsel

Class Counsel is experienced in class action litigation and had a substantial amount of information to evaluate, negotiate and make well-informed judgments about the adequacy of the Settlement. In Class Counsel's opinion, the Settlement is fair, reasonable and adequate. See Declaration of David Fish. See Doc.# 28-5.  It is appropriate for the Court to place significant weight on the endorsement of this Settlement by Class Counsel. Class Counsel exercised their experience based on an intimate knowledge of the facts of the case and the legal issues facing the Class, including conducting an independent analysis of the strengths and weaknesses of the claims and value of the claims and the time costs, as well as the expense of trials and appeals. When experienced counsel supports the settlement, as they do here, their opinions are entitled to considerable weight. *See In re Mexico Money Transfer Litigation*, 164 F. Supp. 2d at 1020; *Reed v. General Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983). "[J]udges should not substitute their

10

own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir.1999) (citation omitted); *Grove v. Principal Mutual Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001).

Fish Potter Bolaños, P.C. (formerly Fish Law Firm, P.C.) has been Class Counsel for numerous class wage settlements and other types of class actions. See Doc.# 28-4, 28-5. Courts in this District have found this law firm are qualified class counsel. *See Pietrzycki v. Heights Tower Serv., Inc.*, 197 F. Supp. 3d 1007, 1019 (N.D. Ill. 2016) (appointing David Fish class counsel after noting his "litigation experience in labor/employment cases as well as class actions[,]" as well as his and his firm's diligence). Furthermore, Fish Potter Bolaños, P.C. has and is serving as counsel in many completed and pending wage class action cases and therefore has extensive experience in these fields. Put simply, and for the reasons discussed in detail above, Class Counsel believe that the Settlement provides outstanding monetary and prospective relief without the uncertainty and delay those years of litigation would bring. That certainly in the best interests of the Settlement Class.

### 5. The Settlement Was the Result of Arm's Length Negotiations Without Any Hint of Collusion

The Settlement was the result of adversarial, arm's length negotiations over several months. This involved negotiating potential damages from payroll data produced by Defendant. In determining whether a settlement was reached absent any collusion between the parties, courts look to whether the settlement negotiation is "intense, vigorous, and at arm's length." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020. Such arm's-length negotiations conducted by competent counsel constitute *prima facie* evidence of a fair settlement. *Berenson v. Fanueil Hall Marketplace*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("where . . . a proposed class settlement has

11

been reached after meaningful discovery, after arm's-length negotiation by capable counsel, it is presumptively fair."). In the absence of any evidence of collusion, this factor favors final approval of the settlement. *See Winston v. Speybroeck*, No. 3:94-CV-150AS, 1996 U.S. Dist. LEXIS 12131, at *15-16 (N.D. Ind. Aug. 2, 1996). The Court should therefore find that the Settlement meets the requirements of and was the result of arm's-length bargaining.

## V. THE COURT SHOULD APPROVE THE ATTORNEY FEES AND COSTS, SERVICE AWARDS, AND CLAIMS ADMINISTRATOR FEES.

### A. The Court Should Approve One-Third of Gross Settlement Fund As Attorney Fees

#### 1. Class Counsel Negotiated a Settlement Structure that Favors FLSA Collective and Rule 23 Class Members

To begin, the Gross Settlement Fund of $220,617.00 represents a gross recovery of 100% of alleged overtime owed, liquidated, and statutory damages under the FLSA and IMWL, before accounting for attorney fees, costs, settlement administrator fees and service award. This is an excellent result for Settlement Class Members.

#### 2. The Court Should Award Attorney's Fees as a Percentage of the Fund

The Court should award attorney's fees as a percentage of the settlement fund made available to the FLSA Collective and Illinois Class Members. When counsel's efforts result in the creation of a common fund, counsel is "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 548 (7th Cir. 2003) (creation of common fund "entitles [counsel] to a share of that benefit as a fee"). This is "based on the equitable notion that those who have benefited from litigation should share in its costs*." Sutton v. Bernard,* 504 F.3d 688, 691-92 (7th Cir. 2007) (quoting *Skelton v. G.M. Corp.,* 860 F.2d 250, 252 (7th Cir. 1988)); *Kaplan v. Houlihan Smith & Co*., No. 12 Civ. 5134, 2014 WL 2808801, at *3 (N.D. Ill. June 20, 2014); *see also Boeing,* 444

12

U.S. at 478.

Although there are two ways to compensate attorneys for successful prosecution of statutory claims – the lodestar method and the percentage of the fund method, *see Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 565-66 (7th Cir. 1994) – the favored approach in the Seventh Circuit is to use the percentage of the fund method in common fund cases like this one. "Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to ex ante." *In re FedEx Ground Package System, Inc. Employment Practices Litig.,* 251 F. Supp. 3d 1225, 1236 (N.D. Ind. 2017) (citing *In re Synthoid Mktg. Litig.,* 325 F.3d 974, 979-80 (7th Cir. 2003)); *see also McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2011 WL 13257336, at *3 (N.D. Ill. Aug. 29, 2011) ("Many courts have found the percentage-of-recovery method provides a good emulation of the real-world market value of attorneys' services provided on a contingent basis."). It is especially appropriate to use a common fund approach in cases based on fee shifting statutes when the "settlement fund is created in exchange for release of the defendant's liability both for damages and for statutory attorneys' fees . . . ." *Skelton,* 860 F.2d at 256; accord *Florin,* 34 F.3d at 564. Here, the Settlement releases Collective and Class Members' statutory claims to fees. There are several other reasons that courts in the Seventh Circuit favor the percentage of the fund method. First, the percentage of the fund method promotes early resolution and removes the incentive for plaintiffs' lawyers to engage in wasteful churning of the file to increase their billable hours. *See In re Synthroid Mktg. Litig.,* 264 F.3d 712, 789-90 (7th Cir. 2001). Where attorneys' fees are limited to a percentage of the total, "courts can expect attorneys to make cost efficient decisions about whether certain expenses are worth the win." *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill. 1996), aff'd, 160

13

F.3d 361 (7th Cir. 1998); *see also In re Amino Acid Lysine Antitrust Litig.*, No. 95 Civ. 7679, 1996 WL 197671, at *2 (N.D. Ill. Apr. 22, 1996) (explaining "growing recognition that in a common fund situation . . . a fee based on a percentage of recovery . . . tends to strike the best balance in favor of the clients' interests while at the same time preserving the lawyers' self-interest").

Courts in the Northern District of Illinois routinely approve one-third of the settlement fund as attorneys' fees in FLSA collective actions settlements. *See, e.g., Castillo v. Noodles & Co.*, 2016 WL 7451626 (N.D. Ill. Dec. 23, 2016), at *3-4 (awarding one-third of a $3,000,000 settlement fund in FLSA overtime action); *Furman v. At Home Stores LLC*, No. 2017 WL 1730995, at 3-4 (N.D. Ill. May 1, 2017) (awarding one-third of $990,000 settlement fund in FLSA overtime action); *Briggs v. PNC Financial Services Group, Inc.*, 2016 WL 7018566, at *1 (N.D. Ill. Nov. 29, 2016) (awarding one-third of $2,000,000 settlement fund in FLSA overtime action); *Day v. NuCO2 Mgmt., LLC*, 1:18-CV-02088, 2018 WL 2473472, at *1 (N.D. Ill. May 18, 2018) (awarding one-third of $900,000 settlement fund in case that was settled before filing suit); *Koszyk*, 2016 WL 5109196, at *3-4 (awarding one-third of $2,825,000 settlement fund in FLSA overtime case). Consistent with the Seventh Circuit's admonition to award attorneys' fees that approximate the market rate, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), these courts explain that one-third of the settlement fund is consistent with market rates in the Northern District of Illinois charged by experienced plaintiffs' counsel in contingent-fee wage and hour class and collective actions.

Second, the percentage method preserves judicial resources because it saves the Court from the cumbersome task of reviewing complicated and lengthy billing documents. *Florin*, 34 F.3d at 566 (noting "advantages" of percentage of the fund method's "relative simplicity of administration"); *Gaskill*, 942 F. Supp. at 386 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437

14

(1983) (fee requests "should not result in a second major litigation")). Courts in this district routinely apply the percentage method to common fund settlements and have noted the advantages of this approach. *See, e.g.*, *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1040 (N.D. Ill. 2011) (using percentage method because it did "not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion"); *Gaskill*, 942 F. Supp. at 386 (describing advantages of percentage method, including judicial efficiency and an "efficient check on the attorney's judgment" in economic decision-making). As the Second Circuit has explained, the "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000) (citation omitted)

### 3. The Market for Legal Services Supports Plaintiff's Request.

In deciding the fee to award in common fund cases, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton*, 504 F.3d at 692-94, citing *In re Synthroid Mktg. Litig.*, 264 F.3d at 718 (collecting cases)). The Seventh Circuit has held that "[a]lthough it is impossible to know ex post exactly what terms would have resulted from arm's-length bargaining ex ante, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005). The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("[w]hen the 'prevailing' method of compensating lawyers for

15

'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original). In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff,* 786 F.2d at 325; see also *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998).

Here, prior to filing the Complaint, Class Counsel executed a fee agreement with the Class Representative that entitled Class Counsel to attorney's fees equal to 40% of any recovery but Class Counsel has elected to only seek one-third. Because the Parties negotiated an attorneys' fees arrangement at the start of the litigation, the presumption of market-rate reasonableness applies. See *Briggs v. PNC Financial Services Group, Inc.,* No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016). Class Counsel is seeking one-third of the common fund plus $431.63 [below it says there was a cap] in litigation costs and the Class Representative's requested service award of $7,500. This percentage is consistent with the low end of standard contingent fee awards in the Northern District of Illinois. See *Dobbs v. DePuy Orthopaedics, Inc*., 885 F.3d 455, 459 (7th Cir. 2018) ("The typical contingent fee is between 33 and 40 percent") citing *Gaskill v. Gordan*, 160 F.3d at 361, 362 (7th Cir. 1998); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (customary contingency fee ranges from 33 1/3% to 40% of the amount recovered); *Prena v. BMO Fin. Corp.,* No. 15 C 09175, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) (contingency of 33-40% is typically charged in FLSA cases*); In re Diary Famers of Am., Inc*., 80 F. Supp. 3d 838, 845 (N.D. Ill. 2015) (the usual range of contingent fees is between 33 and 50 percent); *McDaniel,* 2011 WL 13257336, at *4 ("[T]he real-word market range for contingent fee cases is 33% to 40%.").

### 4. The Risk of Non-Payment Supports the Requested Attorney's Fee Award

Counsel's decision to seek the market rate is also reasonable in light of the significant risks of nonpayment that Class Counsel faced if the case did not prevail. At the outset of the litigation, Class Counsel took "on a significant degree of risk of nonpayment" in agreeing to represent Class Representatives. *Taubenfeld*, 415 F.3d at 600 (approving of district court's reliance on this factor in evaluating attorneys' fees). Class Counsel took this case on a contingent fee basis and assumed the risk that they would receive no fee for their services. Ex. 5, ¶9. See *Sutton*, 504 F.3d at 693-94 (7th Cir. 2007) ("We recognized [in an earlier case] that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of the suit."). Here, Class Counsel faced risk in establishing that class treatment was appropriate and proving class liability. Defendants would likely have asserted additional defenses and the litigation would have been protracted and expensive. In particular, issues surrounding Covid-19 are largely unchartered waters within in the law. Given these risks, Class Counsel "could have lost everything" they invested. *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (Posner, J.).

Class Counsel's fee request should be approved because it is reasonably based on the market rate. No further showing or analysis is needed. *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, 251 F. Supp. 3d at 1243 ("A lodestar cross-check … isn't encouraged in this circuit."); *Wright v. Nationstar Mortgage LLC*, No. 14 C 10457, 2016 WL 4505169, at *17 (N.D. Ill. Aug. 29, 2016) (courts can skip a lodestar check); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 n.27 (N.D. Ill. 2011) ("use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive"). This is because the recovery for Class

Members is substantial, Members did not have to submit any sort of claim form, and the settlement does not present indicia that it was the product of collusion between the Parties at the expense of Class Members. *See Williams v. Rohm & Haas Pension Plan,* 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *In re Dairy Farmers of Am.,* 80 F. Supp. 3d 838, 850 (N.D. Ill. 2015) ("For attorneys who are arguing for a percentage-of-the-fund fee award, any delineation of hours is seemingly unnecessary . . . ."). Although courts occasionally review counsel's lodestar as "a cross-check to assist in determining the reasonableness of the fee award," *Heekin v. Anthem,* Inc., No. 05 Civ. 1908, 2012 WL 5878032, at *2 (S.D. Ind. Nov. 20, 2012), the lodestar crosscheck is of limited utility because "[u]ltimately . . . the market controls," *In re Trans Union Corp. Privacy Litig*., No. 00 Civ. 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009); *Wright*, 2016 WL 4505169, at *17 ("Nor the is the lodestar an accurate representation of the hypothetical market agreement between the plaintiffs and their attorneys"). As explained above, because Class Counsel's substantial work to date has "bought" a significant recovery for Class Members, the Court need not analyze Class Counsel's lodestar.

The benefit the Settlement provides Class Members is excellent: Members are receiving 100% of their unpaid overtime, FLSA liquidated damages, and IMWL treble damages, additionally a floor is set, so many will receive more than their actual unpaid overtime. Nor will Class or Collective be required to provide a general release to participate in the Settlement—the release is limited to wage claims. The absence of a general release exemplifies the results achieved for Collective and Class Members. *See Ramah Navajo Chapter v. Babbitt,* 50 F. Supp. 2d 1091, 1103-04 (D.N.M. 1999) (noting the limited, rather than general, release as further evidence of an exceptional result in favor of class members). Thus, based upon the negotiated fee agreement in this case, the normal rate of compensation in similar cases, the risk Class Counsel undertook in

18

engaging in this litigation, and the excellent result achieved for Members, Class Counsel is entitled to reasonable attorney's fees of one third of the fund and reimbursement of costs

**B.      The Incentive Award and Costs Are Appropriate and Should Be Approved.**

Plaintiff request $7,500, as incentive awards for Mr. Sanchez's participation in this case— he was instrumental to this case and it is because of his bravery hundreds of employees will get substantial payments. He aided Class counsel in investigating these claims. In employment-related class actions, incentive awards are particularly appropriate because it is common for prospective employers to do background checks on employees that reveal that they sued a past employer. In fact, if you type "Victor Sanchez lawsuit" into Google, one of the first results is a link to a PDF of his Class and Collective Complaint. While perhaps retaliation is or should be illegal, it's hard to prove and many employers will think twice about hiring a low-wage worker who cost a prior employer over $200,000 dollars because they stood up for the rights of hundreds of co-workers.

Courts in the Northern District of Illinois routinely award even larger service payments to named plaintiffs who perform similar actions to recover settlement funds on behalf of similarly situated employees in collective actions. *Furman*, 2017 WL 1730995, at *3 (approving $10,000 service award to named plaintiff in overtime collective action); *Briggs*, 2016 WL 7018566, at *2 (approving $12,500 service awards to named plaintiff in overtime collective action); *Castillo*, 2016 WL 7451626, at *2 (approving $10,000 service awards to named plaintiff in overtime collective action); *Koszyk*, 2016 WL 5109196, at *2 (same).

Plaintiff's counsel incurred $431.63 related to this case but agreed to cap their costs at $420.20 in the Settlement Agreement so that is what is requested here.

**C.      The Claims Administrator Fees Should Be Approved.**

The Settlement Agreement provides that the Claims Administrator be paid from the Gross

Settlement Fund. Analytics estimated its fees and costs would be $10,000 to administer this settlement. They have not increased this estimate. The Claims Administrator has performed all necessary tasks, including mailing notices, creating a website, checking addresses and skip-tracing, collecting claim forms, maintaining records, calculating taxes and award distribution, and responding to Plaintiffs' and Defendants' counsels inquiries. Ex. 1, ¶4-15. The Court should approve $10,000 be paid to the Claims Administrator from the Settlement Fund pursuant to the estimate and Agreement.

## VI.    **CONCLUSION**

The Parties' Settlement Agreement should be approved as it is fair, adequate, reasonable and the attorney fee and cost request, administrator costs and fees and incentive award warrant approval. Therefore, Plaintiffs request that the proposed Final Approval Order (Exhibit 3 which will also be submitted through the Court's email system) be entered.

Dated: May 18, 2022                              Respectfully Submitted,

By: /s/ John Kunze
One of Plaintiff's Attorneys

David Fish
John Kunze
Fish Potter Bolaños, P.C.
200 E 5th Ave Suite 123
Naperville, IL 60563
T: 630-355-7590
F: 630-778-0400

20